J-S15003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.W.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 193 EDA 2022 |

Appeal from the Order Entered December 13, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000151-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: N.A.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 194 EDA 2022 |

Appeal from the Decree Entered December 13, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000047-2019

BEFORE: NICHOLS, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.: **FILED JUNE 28, 2022**

In these consolidated appeals, N.H. (Father) appeals from both the December 13, 2021 permanency review order changing the permanency goal of his son, N.W.H. (Child),[1] from reunification to adoption, and from the

---

[1] Child was born in December of 2016.

December 13, 2021 decree involuntarily terminating his parental rights to Child.[2]  We affirm.

The record reveals that the Philadelphia Department of Human Services (DHS) first became aware of this family when it received a report that Child tested positive for cocaine and methadone at birth.  N.T., 10/12/21, at 9. Following Child's discharge from the hospital in January 2017, he was released to the home of his maternal grandmother, where Mother also resided.  DHS established a safety plan that prohibited Mother from having unsupervised contact with Child, and it implemented in-home services through the Community Umbrella Agency (CUA).  *Id.* at 10.  When Child was approximately two months old, Mother's family placed him in the care of his maternal cousin (N.M.).[3]  *Id.* at 10, 45.  Father was aware of Child's whereabouts, but he was not involved with Child during this time.  *Id.* at 46. Prior to Child's first birthday, Father was incarcerated for drug-related crimes. *Id.* at 35-36, 46.

In November of 2017, N.M. applied for kinship care assistance.  *Id.* at 10, 45-46.  Thereafter, DHS filed a dependency petition, and, following a hearing, the trial court adjudicated Child dependent on January 29, 2018.  The

---

[2] A.W. ("Mother") voluntarily relinquished her parental rights.  The trial court issued a termination decree on April 15, 2019.  Mother did not file a notice of appeal, and she is not a party to this appeal.

[3] The notes of testimony reflect that Child's kinship parents are N.M. and T.E. *See* N.T., 1012/21, at 2, 47; N.T., 12/13/21, at 5.

court placed Child in kinship care with N.M. *Id.* at 9-10. At the time of Child's adjudication, Father remained incarcerated.

In furtherance of Child's permanency goal of reunification, Father was required to participate in and satisfy the following single case plan objectives: supervised visitation; parenting classes; and domestic violence services.[4] *Id.* at 11. In addition, Father was required to obtain suitable housing and employment, and he was required to maintain contact with CUA. *Id.* at 12-14.

The trial court held permanency review hearings at regular intervals. The record reveals that Father remained incarcerated during 2018. Father was released from prison in 2019, on a date unspecified in the record. By the time of the permanency review hearing on October 25, 2019, Father had completed parenting classes, and he was participating in supervised visitation. *Id.* at 11-12. By order the same date, the trial court directed that Father have unsupervised visitation with Child. However, by the next permanency review hearing on January 13, 2020, the trial court found that Father had been taking Child to see Mother, who continued to struggle with substance abuse and mental health problems and who had voluntarily relinquished her parental rights. *Id.* at 14, 41. The CUA caseworker, Helen Thomas, testified that she discussed with Father why it was inappropriate to take Child to see Mother,

---

[4] Father was also required to participate in a substance abuse evaluation. Father did so on July 30, 2019, which resulted in the determination that he did not require substance abuse treatment. N.T., 10/12/21, at 24-25.

and Father informed Ms. Thomas that he did not "think Mother will do any harm to [C]hild." *Id.* Father confirmed Ms. Thomas's testimony during his direct examination. *Id.* at 42. On January 13, 2020, the trial court directed that Father's visits with Child must revert to supervised visits. *Id.* In addition, the trial court ordered Father to participate in a Parenting Capacity Evaluation (PCE). *Id.* at 14-15.

Father was incarcerated during the summer of 2020, on a charge alleging that he had violated his probation. *Id.* at 31-32. At the time of his incarceration, Father had not participated in a PCE or in a domestic violence program. Father remained in prison for approximately one year on the pending charge, which was ultimately dismissed. *Id.* at 32.

On May 17, 2021, DHS filed a petition to change Child's permanency goal to adoption. On May 28, 2021, DHS filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The trial court conducted a combined evidentiary hearing on October 12, 2021, when Child was nearly five years old. Child's best interests were represented by Carla Beggin, Esquire, the guardian *ad litem* (GAL). Child's legal interests were represented by Bernadette Perkins, Esquire (Child Advocate). N.T., 10/12/21, at 3; N.T., 12/13/21, at 6.

DHS presented the testimony of Helen Thomas, the CUA case worker; and N.M., the kinship foster care mother with whom Child has lived since he was approximately two months old. Father, who had been released from prison after his pending criminal charge was dismissed, testified on his own

behalf. At the conclusion of the testimonial evidence, the trial court held its decision in abeyance at the request of the Child Advocate to discuss with Child his preferred outcome of the termination proceeding. N.T., 10/12/21, at 57-58, 60-61. Father was again incarcerated after the October 12, 2021, for reasons not specified in the certified record. *Id.* at 8. Father was released on October 25, 2021, and he remained out of prison on the final date of the termination proceeding. *Id.*

The hearings on this matter continued on December 13, 2021. At that hearing, DHS presented the testimony of Ms. Thomas regarding Child's safety in the kinship home. Thereafter, the Child Advocate stated on the record in open court that she did speak to Child on several occasions since the last court date. N.T., 12/13/21, at 10. Specifically, the Child Advocate stated, in part, that Child "does know [Father]. I would term that more as a friend, or big cousin, or big brother relationship. Father has provided no stability for this child other than an occasional visit." *Id.* at 11.

At the close of evidence on December 13, 2021, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changed Child's permanency goal to adoption. On the same date, the trial court entered a decree and order memorializing its determinations.

On January 6, 2022, Father filed timely notices of appeal and concise statements of matters complained pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. On January 31, 2022, the trial

court issued notices of compliance with Rule 1925(a) referencing its rationale set forth at the conclusion of the proceeding on December 13, 2021.

On appeal, Father raises five issues for review:

1. Whether the [t]rial [c]ourt erred in terminating the parental rights of [Father] under 23 Pa.C.S. § 2511(a)(1)?

2. Whether the [t]rial [c]ourt erred in terminating the parental rights of [Father] under 23 Pa.C.S. § 2511(a)(2)?

3. Whether the [t]rial [c]ourt erred in terminating the parental rights of [Father] under 23 Pa.C.S. § 2511(a)(5)?

4. Whether the [t]rial [c]ourt erred in terminating the parental rights of [Father] under 23 Pa.C.S. § 2511(a)(8)?

5. Whether the [t]rial [c]ourt erred by finding, under 23 Pa.C.S. § 2511(b), that termination of [Father's] parental rights best serves [Child's] developmental, physical and emotional needs and welfare?

Father's Brief at 5 (some formatting altered).[5]

_____

[5] Although Father filed a notice of appeal from the goal change order, he has abandoned this issue on appeal because he has failed to raise or develop any argument concerning the goal change in his appellate brief. Accordingly, any challenge to the goal change is waived. *See, e.g., Commonwealth v. Manigault*, 462 A.2d 239, 240 (Pa. 1983) (holding that issues that not argued or briefed on appeal are abandoned and deemed waived); *Allied Envtl. Serv., Inc. v. Roth*, 222 A.3d 422, 424 n.1 (Pa. Super. 2019) (stating that "[a]n issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived" (citation omitted)). However, as goal change is not a prerequisite to termination of parental rights, we address only the termination of Father's parental rights. *See In Re: Adoption of S.E.G.*, 901 A.2d 1017 (Pa. 2006) (goal change is not condition precedent to termination of parental rights).

Our standard of review is well-settled. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Simply put, "[a]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123–1124.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis. *See* 23 Pa.C.S. § 2511. The trial court must initially

determine whether the conduct of the parent warrants termination under Section 2511(a). Only if the court determines that the petitioner established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted.

It is well settled that we need only agree with any one subsection of Section 2511(a), along with Section 2511(b), to affirm the termination of parental rights. *In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (citation omitted). In this case, we analyze the decree pursuant to Section 2511(a)(2) and (b), which provide as follows.[6]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> * * *

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary

---

[6] Based on this disposition, we need not review Father's first, third, and fourth issues on appeal.

for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal and incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (citation omitted). At a termination hearing, the trial court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the agency or take advantage of available services during the dependency proceedings. *In re S.C.*, 247 A.3d at 1105 (citation omitted).

A previously stated, Father has spent periods of Child's life in prison. In *S.P.*, our Supreme Court addressed the relevance of incarceration on termination decisions under Section 2511(a)(2). Our Supreme Court held "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under Section 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *S.P.*, 47 A.3d at 828. Moreover:

> Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind . . . that the child's need for consistent parental care and stability cannot be put aside or put on hold. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. Rather, a parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Importantly, a parent's recent efforts to straighten out [his] life upon release from incarceration does not require that a court indefinitely postpone adoption.

*In re K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (some formatting altered and citations omitted).

With respect to Section 2511(b), this Court has stated that the trial court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further,

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Our Supreme Court explained, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The *T.S.M.* Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, Father contends that the evidence does not support the termination of his parental rights pursuant to Section 2511(a)(2). Specifically, Father asserts that, even while in prison, he took parenting courses and attempted to maintain contact with Child. Father's Brief at 13. In addition, Father asserts that "his ability to reunify with his son was made more difficult by the pandemic and its effect on the court system which forced his incarceration for over a year on a probation violation, until said arrest was ultimately dismissed." *Id.*

DHS filed a petition to terminate Father's parental rights alleging Father's inability to remedy the factors that caused Child to be dependent and

failure to comply with the trial court's requirements for reunification. However, DHS concedes that from the summer of 2020 through the summer of 2021, Father was incarcerated "on false charges of probation violation. These charges were eventually dropped but not before Father served his maximum sentence." DHS Brief at 8. Nevertheless, DHS also notes that Father was previously in prison for drug-related charges and was incarcerated prior to Child's first birthday, was in prison at the time of Child's adjudication on January 29, 2018, and he remained in jail for the rest that year. *Id.* at 4-5, 8. We also observe that Father was incarcerated on following the termination proceedings on October 12, 2021,[7] and he was released on October 25, 2021. N.T., 12/13/21, at 8.

Additionally, we note that when Father was released from prison in 2019, he participated in supervised visitation with Child, completed parenting classes, and did not require substance abuse treatment. As such, in the permanency review order dated October 25, 2019, the trial court directed that Father have unsupervised visitation with Child. However, on January 13, 2020, the trial court subsequently ordered that Father's visitation was to revert to supervised visitation because the court learned that Father was taking Child to see Mother. Additionally, in the October 25, 2019 permanency review order, the trial court directed Father to undergo a parenting evaluation.

---

[7] The nature of the charges underlying this period of incarceration in October of 2021, is unclear from the certified record.

However, by the time Father was incarcerated in the summer of 2020, he had not complied. Likewise, Father did not participate in a domestic violence program, which had been one of his primary objectives throughout Child's dependency.

Regarding his housing, Ms. Thomas testified that Father resides in his father's house, and Father's father wants Father "to get his own place." N.T., 10/12/21, at 25. Father testified that only he and his father reside in the house, and it has three bedrooms. *Id.* at 42. However, Father testified, "I would like my own space." *Id.* at 43.

Father testified during the proceedings, and on direct examination, he explained that he was currently not able to be reunified with Child:

> [Q]: And your testimony, you want to be part of [Child's] life. Is that right?
>
> [A]: I do.
>
> [Q]: And are you satisfied where [Child] is now?
>
> [A]: I mean I'm satisfied where he's at. I just—like at the end of the day, like I love them people over there.
>
>              \*     \*     \*
>
> And I just don't want to uproot my son from where he [is] at. Like that's . . . not right for me. . . .
>
> But at the same time[,] like I don't want my rights t[a]ken away from my son. That's my son. I take care of my son. I do everything I can for my son. At the end of the day, it's comfortable where he's at. . . .
>
> But at the same time, I don't want my rights t[a]ken away. . . .

- 13 -

> But at the same time, I still need help. And I'm still trying to get myself established. So at the same time I want to put up part of my son's life. I just need help. And I'm trying.
>
> I'm trying to go about it the right way by working. That's a step. I'm having a little trouble getting housing, because it's a little difficult. But I'm going to try. I'm trying.

N.T., 10/12/21, at 33-34.

After careful review, we discern no abuse of discretion. We are cognizant that Father has been incarcerated throughout portions of Child's life. However, whether Father was in or out of prison, his repeated and continued incapacity, neglect, or refusal to participate in a parental evaluation, to complete a domestic violence program, and his failure to secure appropriate housing while not incarcerated, have caused Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. Further, it is apparent on this record that the conditions and causes of Father's incapacity and refusal cannot or will not be remedied. *See S.C.*, 247 A.3d at 1105 (citation omitted) (reiterating that the court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the agency or take advantage of available services during the dependency proceedings). Indeed, Child's need for consistent parental care and stability cannot be put aside or put on hold, and we conclude that there was no abuse of discretion in the trial court finding Father's actions and inactions warrant termination of his parental rights under Section 2511(a)(2). *K.M.W.*, 238 A.3d at 474.

In his final issue, Father contends that the record does not support the termination of his parental rights under Section 2511(b) because there was testimony that Father and Child have "a normal bond." Father's Brief at 15. In addition, Father argues that the record does not support termination because was no bonding evaluation performed in this case. *Id.*

When evaluating a parental bond, "[t]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted). Moreover:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

The trial court found that Child would not suffer irreparable harm if Father's parental rights were terminated. N.T., 12/13/21, at 18. The trial court found that N.M. and T.E. are the only parents Child knows, and Child is bonded to N.M. and T.E. *Id.* The court recognized that Child looks to N.M.

and T.E. for love, comfort, and support, and N.M. and T.E. meet and provide for Child's daily needs. *Id.* Further, the court noted that Father does not want to remove Child from the kinship parent, but instead "just wants to be a part of [Child's] life." *Id.* However, the trial court concluded that it is in Child's best interests to have permanency. *Id.*

The testimony of Ms. Thomas supports the trial court's findings. Although Ms. Thomas did say that Child and Father have a "normal relationship," she clarified that Child does not identify Father as a "caregiver figure." N.T., 10/12/21, at 15-16. Rather, Ms. Thomas testified that Child is bonded to N.M. and T.E., and they are like parents to Child. N.T., 10/12/21, at 18. She testified that Child looks to them for his care, comfort, love, and safety, and that N.M. and T.E. are a pre-adoptive resource. *Id.* at 18-19. Further, the Child Advocate testified that Child "knows who his parents are. And we've already identified them as the caregivers here in the courtroom today[, N.M. and T.E.]." N.T., 12/13/21, at 12.

On this record, we discern no abuse of discretion by the trial court in concluding that the termination of Father's parental rights will best serve Child's developmental, physical, and emotional needs and welfare. Accordingly, we affirm the decree pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/28/2022</u>